## In re KAUFMAN COUNTY IMPROVEMENT DIST. NO. 4.

### No. 4008.

District Court, N. D. Texas, Dallas Division.

July 22, 1940.

Fred T. Porter, of Kaufman, Tex., and J. Lee Gammon, of Waxahachie, Tex., for the plan.

O. D. Brundidge, of Dallas, Tex., and Keys & Holt, of Corpus Christi, Tex., opposed.

ATWELL, District Judge.

The new Act, which was approved on June 28, 1940, 11 U.S.C.A. §§ 401, 403, is substantially the same as the Act under which we moved at the time of the filing of this application, in so far as the matters at issue are concerned.

In Section 3 of the amendment, 11 U.S.C.A. § 403, it is provided that:

"At the conclusion of the hearing, the judge shall make written findings of fact and his conclusions of law thereon, and shall enter an interlocutory decree confirming the plan if satisfied that

"(1) it is fair, equitable, and for the best interests of the creditors and does not discriminate unfairly in favor of any creditor or class of creditors."

There are five other subdivisions which are substantially the same as the five subdivisions in subdivision (e) of the amended Act under which this petition was filed.

A large percentage of the holders of these $775,000 in bonds are here, that is a percentage in excess of the two-thirds required by the ultimate step upon which the court must act. But, regardless of notices and attempts to reach other holders, they are not here. We need not give too much weight, in fact we need not give any weight, to the testimony with reference to the anticipation of the breakdown of payments by those who had lands within this district, as exhibited in Mr. Mitchell's testimony, and Mr. Higginbotham's testimony, because we find that without that testimony there was an uniform action, during the latter part of the years, to say the least of it, when all who owned lands in there paid nothing, a situation which is distressing. This $775,000 in bonds is now over $900,000, with the accrued interest. That is the money that was spent there to dig those ditches and build those levees. It was spent there, not under the supervision of the bond buyer, but under the supervision of the bond seller.

Now, these bond sellers have also become bond buyers when the original bond buyers were dissatisfied or were disgusted with their investments, or it may be that they needed their money and they began to sell them very cheap and very low. There is no testimony here that any of these gentle-

men bought bonds at four cents as stated by Mr. Brundidge, the lowest is thirteen cents, but there is testimony that someone saw a letter offering four cents, but the letters were not offered in evidence; they were mere letters, so the witness says.

But, be that as it may, those who hold the block of bonds, substantially one-third in amount, $300,000, or somewhat less than that, scattered throughout the United States, are not here. Only one non-levee district land owner is here with bonds. His bonds. plus interest, aggregate approximately $50,000.

I cannot say, as a matter of law, that this is "fair and equitable"—"fair and equitable and for the best interest of the creditors, and does not discriminate unfairly in favor of any creditor or class of creditors." I cannot say that. It does discriminate. That is the purpose of it. That is the reason they went this route. There is little use to talk about that. It is apparent on its face; they thought if they did nothing and paid nothing and let it go to weeds and grass, then they could buy it in and do what they pleased with it, and I am not going to approve it.

There are some other very material features about it that have been suggested, that are new thoughts to me. I believe that those new features could be ruled by the provision of the law which permits the entry of an interlocutory decree, and then when the provisions of the plans are ripened, the final decree could be entered.

I have said that because that is the situation with reference to the payment of the $2 per acre, by the owners of the 11,600 acres that are within the district. I suspect if someone did not want to pay that assessment the others could pay it for them, but I believe that hurdle could be surmounted by the provisions of the law, unless there is something in the new Act I have overlooked.

### Findings of Fact

I find that there are approximately 11,-600 acres of land within this irrigation district.

That approximately 4,000 acres are timber and never have been cultivatable.

That the amount of bonded indebtedness against that district is approximately $775,-000 in bonds, maybe a little less than that, because some payments have been made,

plus accrued interest, which makes the aggregate about $900,000 at the present time.

That, as shown by the petition, and supported by the testimony, the plan is to borrow $250,000 from the Reconstruction Finance Corporation on the lands, $200,000 of which are to be used in the rehabilitation of the dams and other necessities to prevent water from flooding the area. $49,360 are to be used in the payment of bondholders, which approximates 8 cents per bond. Therefore, the landowners get the indirect benefit of $200,000 plus the 8 cents, if the landowner happens to be also a bondholder, while the bondholder, if not a landholder, gets only the 8 cents.

That while there may have been some assessments made during the years from 1930 to 1940, that those assessments have not been paid by the bondholders and that in truth payments of such levee district assessments were discontinued prior to 1930, and that such discontinuance has been practically unanimous. There may have been some few who did pay, but it seems to me from the testimony that it should be found, and I do find, that there was a concert of action in that direction.

That the land, in its present overflowing and foul state, is of practically no value.

That that finding should be shaded by the finding that it may be used for pasturage, to some extent, and that there are some high points which are liable to cultivation in years when the flood is not excessive.

That for those sporadic purposes the land does not exceed in value $5 per acre.

That it would require to place it in cultivation approximately two or three years at a cost of approximately $7.50 to $15 per acre.

That there are approximately fifteen breaches in the main river levee, with half a dozen breaches on the south end of the levee.

That there are many breaches, perhaps half that number, on the hillside levee.

That there are other damages to both the Hillside and the River levee.

That if $200,000 would make these levees waterholding so that the district would not be flooded at high water stages, that then and in that event the land would be worth, which is tillable, $50 per acre.

That that land which would be so increased in value by this RFC loan which

672

·is a loan by the people would redound to ·the benefit of the landholders and not to the benefit of all of the bondholders.

That such result is itself discriminatory and unfair to the non-landholding bondholders.

I think I have already found, if I haven't I do now, that I think this condition is the result of a tacit understanding by the landholders within the district.

· That there is no testimony here that there was any pressure upon any landholder in the district by any bondholder to require that landholder to buy his bonds.

That the bondholders, during the entire ten years delinquency, had not themselves brought any suit against any of the delinquent taxpayers in the district.

### Conclusions of Law

It follows that I cannot approve this plan because of its unfairness and discriminatory nature toward creditors, and the petition may, therefore, be dismissed.

The order to be drawn, saving such exception as the proponent may care to save.